RECORD NO. 12-4469

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## KEITH FRANKLIN SIMMONS,

*Defendant – Appellant*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

———————

### REPLY BRIEF OF APPELLANT

———————

Henderson Hill
Executive Director
FEDERAL DEFENDERS OF
  WESTERN NORTH CAROLINA, INC.

Ann L. Hester
FEDERAL DEFENDERS OF
  WESTERN NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
(704) 374-0720

*Counsel for Appellant*

Joshua B. Carpenter
FEDERAL DEFENDERS OF
  WESTERN NORTH CAROLINA, INC.
1 Page Avenue, Suite 210
Asheville, North Carolina 28801
(828) 232-9992

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION ..........................................................................................1

ARGUMENT ...............................................................................................2

I.      Simmons's Money Laundering Convictions Are Invalid Under
        *Santos* And *Cloud* ....................................................................2

II.     The Admission Of Victim-Impact Testimony Requires Vacatur
        Of Simmons's Convictions ..........................................................10

III.    The District Court Committed Procedural Error In Applying The
        Aggravating Role Enhancement Based On Simmons's Role In
        The Underlying Fraud ..................................................................13

IV.     A *De Facto* Life Sentence For Simmons Is Substantively
        Unreasonable ..............................................................................15

CONCLUSION ...........................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Freeman v. United States,*
    131 S. Ct. 2685 (2011) .............................................................................9

*Puckett v. United States,*
    556 U.S. 129 (2009) .......................................................................... 13-14

*Rita v. United States,*
    551 U.S. 338 (2007) ...............................................................................17

*Sullivan v. Louisiana,*
    508 U.S. 275 (1993) ........................................................................ 1, 12

*United States v. Billups,*
    536 F.3d 574 (7th Cir. 2008) ...............................................................14

*United States v. Castro,*
    704 F.3d 125 (3d Cir. 2013) ...................................................................9

*United States v. Cloud,*
    680 F.3d 396 (4th Cir. 2012) ....................................................*passim*

*United States v. Copple,*
    24 F.3d 535 (3d Cir. 1994) ...................................................................11

*United States v. Dorsey,*
    45 F.3d 809 (4th Cir. 1995) .................................................................12

*United States v. Genao-Sanchez,*
    525 F.3d 67 (1st Cir. 2008) ...................................................................9

*United States v. Hamilton,*
    701 F.3d 404 (4th Cir. 2012) ...............................................................14

*United States v. Hughes,*
    401 F.3d 540 (4th Cir. 2005) ...............................................................12

*United States v. Passaro,*
    577 F.3d 207 (4th Cir. 2009) .................................................................14

*United States v. Santos,*
    553 U.S. 507 (2008) ....................................................................*passim*

*United States v. Van Alstyne,*
    584 F.3d 803 (9th Cir. 2009) ........................................................*passim*

*United States v. Washington,*
    702 F.3d 886 (6th Cir. 2012) .................................................................11

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) .................................................................................13

## STATUTES

18 U.S.C. § 1343 .............................................................................................5

18 U.S.C. § 3553 ........................................................................................ 2, 16

18 U.S.C. § 3553(a) ..................................................................................16, 17

## RULES

Fed. R. Evid. 609 ...........................................................................................11

Fed. R. Evid. 609(a)(2) ............................................................................10, 11

## GUIDELINES

U.S.S.G. § 2S1.1 ........................................................................................ 9, 15

U.S.S.G. § 3B1.1 .......................................................................................13, 15

## OTHER AUTHORITIES

U.S.S.C., 2011 Sourcebook of Federal Sentencing Statistics ...........................16

U.S.S.C., Measuring Recidivism: The Criminal History Computation of the
Federal Sentencing Guidelines (May 2004) .....................................................17

## <u>INTRODUCTION</u>

The trial and sentencing proceedings that yielded a *de facto* life sentence of 600 months in prison for Keith Simmons—a non-violent, first-time offender—were flawed in several key respects.

First, Simmons's money laundering convictions are invalid under this Court's decision in *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012), because they involved the "essential expenses" of the underlying Ponzi scheme. Although the Government's response brief attempts to distinguish investor payouts in a Ponzi scheme from the types of payments at issue in *Cloud*, its proposed distinctions lack merit. Indeed, the Ninth Circuit has faced the precise issue presented here and concluded that investor payouts made to encourage additional investment are an essential expense of a Ponzi scheme. *See United States v. Van Alstyne*, 584 F.3d 803, 809-15 (9th Cir. 2009). This Court should reach the same conclusion and reverse Simmons's money laundering convictions.

Second, the admission of irrelevant and "gut wrenching" victim-impact testimony rendered Simmons's trial fundamentally unfair. This error requires reversal of his convictions because, regardless of how strong the other evidence of guilt was, there remains a real possibility that the jury's verdict *in this case* was driven by the emotional impact of the erroneously admitted testimony. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

Finally, Simmons's sentence was fatally flawed. The district court committed procedural error by applying the wrong legal standard in imposing a four-level, aggravating-role enhancement. And a *de facto* life sentence is substantively unreasonable because it is much longer than necessary to serve the sentencing purposes set forth in 18 U.S.C. § 3553.

## ARGUMENT

**I.    Simmons's Money Laundering Convictions Are Invalid Under *Santos* And *Cloud*.**

Simmons argued in his opening brief that his money laundering convictions must be reversed under the Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008), as interpreted by this Court in *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012). *See* Simmons's Op. Br. at 26-34. The alleged money laundering transactions—payments to satisfy withdrawal requests from investors Till Lux and James Bazluki—involved the "essential expenses" of the underlying Ponzi scheme. Thus, as in *Cloud*, the money laundering convictions "present[ ] a merger problem" that requires reversal. 680 F.3d at 407; *see also United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009) (reversing money laundering convictions due to merger problem created by investor payouts in a Ponzi scheme).

In its response, the Government attempts to distinguish *Cloud*. It argues that the Ponzi scheme "did not depend on" payments made to fulfill investor withdrawal requests. Gov't Br. at 52. According to the Government, such payments "are

2

qualitatively and critically different" from the payments in *Cloud* and *Santos* "because there would be no mortgage fraud [as in *Cloud*] nor illegal gambling operation [as in *Santos*], if co-conspirators in a mortgage-fraud scheme and the winners in a gambling operation were not paid." Gov't Br. at 55-56.

The Government's purported distinction is unavailing. The payments to Bazluki and Lux were every bit as "essential" to the successful operation of the Ponzi scheme as the payments at issue in *Cloud*. Just as "Cloud lured his coconspirators with promises of payment" (680 F.3d at 407), so too Simmons lured potential Black Diamond investors with similar promises. Were it not for the initial payouts to investors like Lux and Bazluki, the Black Diamond scheme never would have gotten off the ground.

The experience of investor Till Lux is illustrative. After learning about Black Diamond from Deanna Salazar, Lux initially invested $10,000 in January 2008. He did so based on a written agreement that expressly allowed him to make withdrawals from his account following a 90-day initial waiting period. *See* Supp. JA 19 (Gov't Trial Exh. 14, at p.6). Consistent with that agreement, Lux subsequently made "a withdrawal to see if it was actually a real thing." JA 640. After confirming that he could in fact withdraw the money as promised by the agreement, Lux made additional investments, ultimately totaling $96,000. JA 1155. He also continued exercising his contractual right to periodically withdraw funds, including a $16,000 withdrawal on October 19, 2008, that formed the basis for the money laundering offense charged in

3

Count Four of the indictment. JA 43, 645. Lux's continued ability to withdraw funds led him to recommend Black Diamond to numerous friends, with whom he shared proof of the withdrawals. Thanks to Lux's recommendation, at least a half-dozen of his friends invested in Black Diamond, each for a minimum of $10,000. JA 646-47, 702-05.

James Bazluki's experience was similar. He initially invested $250,000 in Black Diamond in December 2007—again, like Lux, based on an agreement that allowed withdrawal on demand after an initial 90-day waiting period. JA 581-82; *see also* Supp. JA 6 (Gov't Trial Exh. 13, at p.6). Shortly after that 90-day period elapsed, Bazluki withdrew $150,000 from his account in March 2008, a transaction that formed the basis for the money laundering offense charged in Count Three of the indictment. JA 43, 586-87. Based on his ability "to request money out of the account as per the agreement," Bazluki "felt secure that [Black Diamond] was a good place to have [his] money." JA 587-88. For that reason, he later made additional investments in Black Diamond, ultimately investing a total of $320,000. JA 1149.

In *Van Alstyne*, the Ninth Circuit considered a similar Ponzi scheme and reached the same legal conclusion that Simmons urges here. It concluded that two money laundering convictions—based on payouts to investors in a Ponzi scheme— were invalid under *Santos* because they merged with the mail fraud charges arising from the Ponzi scheme. 584 F.3d at 814-15. The Court reached this conclusion after carefully considering the crucial role that investor payouts play in a Ponzi scheme:

> [I]ssuing distribution checks that supposedly represented generous returns on his victims' investment was a central component of the "scheme to defraud."  Doing so directly inspired investors to send more money to Van Alstyne's funds, which could then be used to pay returns to other investors.  The very nature of the scheme thus required some payments to investors for it to be at all successful.  In sending the January and June distribution checks funded by the money transfer that was charged as money laundering, Van Alstyne 'enter[ed] into a transaction paying the expenses of his illegal activity,' *Santos*, 128 S. Ct. at 2027 (plurality opinion). Convicting Van Alstyne of money laundering for the bank transfers inherent in the "scheme" central to the mail fraud charges thus presents a "merger" problem closely parallel to the one that underlay the majority result in *Santos*.

584 F.3d at 815.

That the investor payouts in Simmons's case present a similar merger problem is apparent from the indictment itself.  Count Two alleged that Simmons violated the wire fraud statute (18 U.S.C. § 1343) by devising and executing a "scheme and artifice to defraud."  JA 42.  Specifically, that count alleged that Simmons executed the scheme by "send[ing] e-mails, telephone calls, and wire transfers to investors and their intermediaries in other States" and by "wir[ing] ponzi payment to investors and their intermediaries in other States."  *Id.*  And these same actions—wiring payments to investors—formed the basis for the money laundering offenses charged in Counts Three and Four.  JA 43.

Consistent with the indictment, the Government contended at trial that the payouts to investors like Bazluki and Lux were crucial to the success of the Ponzi scheme.  In its closing statement, for example, the Government argued that Simmons

made payouts to investors like Lux and Bazluki "to give the investors confidence that the scheme is working, [and that] their investment is good," which in turn "induce[d] them to put even more money back into the scheme."  JA 887.  As the Ninth Circuit recognized in *Van Alstyne*, such payments represent the central expense of a Ponzi scheme.  584 F.3d at 815.  For that reason, the payments to Bazluki and Lux create a "merger problem" under *Santos* and *Cloud*, meaning that Simmons's money laundering convictions must be reversed.

The Government makes several other attempts to distinguish *Santos* and *Cloud*. It suggests, for example, that those cases involved payments of a "debt certain" whereas it (mistakenly) characterizes the investor payouts here as "discretionary payments in discretionary amounts made on no schedule in particular." Gov't Br. at 56-57.  But, as described above, the payouts to Bazluki and Lux were not "discretionary" in any sense—they were payments Simmons and Black Diamond were contractually obligated to make.  And, far from being "made on no schedule in particular," the payments were due upon the investor's request, subject to a contractually stipulated ten-day processing period.  *See* Supp. JA 6, 19.

For the same reasons, the Government is wrong to describe the investor payouts as the "reinvestment of profits." Gov't Br. at 56.  That description might (arguably) be apt where the perpetrator of a fraud scheme makes payouts that he is not legally obligated to make.  But that simply wasn't the case here.  Instead, a central component of this Ponzi scheme was the promise—memorialized in a contract—that

6

investors would be able to withdraw funds on demand. And, in fact, both payments in question were made in response to an investor's exercise of those contractual rights.

In addition, the Government argues that the payments to Lux and Bazluki cannot be considered "essential" because the scheme dragged on for several months after Simmons "began refusing payments by March 2009." Gov't Br. at 56. As an initial matter, the Government is incorrect to suggest that investor payouts stopped in March 2009. Although Simmons began in February 2009 to express concerns about the capacity to fulfill investor payout requests (*see*, *e.g.*, JA 146-47), he continued making payouts through the end of July 2009. *See* JA 997-1003 (chart of investor payouts).

In any event, contrary to the Government's suggestion, the facts of this case illustrate just how essential payment of investor distribution requests was: soon after Simmons began delaying the contractually-required payouts, the scheme fell apart. Although it took some time for it to fully unravel, the facts show that the scheme was doomed as soon as the payouts stopped and the existing investors began clamoring for repayment.

Moreover, that it took a few months for the scheme to collapse entirely is neither a surprise nor a basis to distinguish *Santos* and *Cloud*. Consider *Santos*'s illegal gambling operation. A bookie who stops paying winners could, like Simmons, continue his scheme for a (potentially extended) period of time by promising deferred

7

payment to the winners while still collecting bets from new gamblers who've not yet been refused payment. What this shows is that a payment can be "essential" to a scheme even if failure to pay (while promising to do so later) does not cause the scheme to collapse *immediately*. If such an immediate collapse were required, not even the gambling-related expenses in *Santos* would qualify as "essential." Indeed, few expenses ever would.

Finally, the Government argues in the alternative that "even if investor payments by Ponzi scheme operators may sometimes be considered essential expenses, the payments made by Defendant to Bazluki and Lux in this case do not qualify as essential expenses." Gov't Br. at 57. But the rationale offered in support of this argument—that each payment was intended to encourage additional investment (*id.* at 57-58)—does not support the Government's theory that these payments were somehow different than a typical investor payout in a Ponzi scheme. On the contrary, it shows that the payments were for precisely the type of expenses that *Van Alstyne* found "essential" to a Ponzi scheme. *See* 584 F.3d at 815 (concluding that investor payments were "essential" to Ponzi scheme because they "inspired investors to send more money").[1]

---

[1]    In *Van Alstyne*, the Ninth Circuit also held that one unusual investor payment was not an "essential" expense of the Ponzi scheme and thus did not merge with the underlying fraud charges. 584 F.3d at 815. That payment was a full refund to a single investor and was made after the scheme began to unravel. *Id.* The Ninth Circuit reasoned that the refund was not an essential expense of the Ponzi scheme because it "undermined rather than advanced the core scheme." *Id.* Unlike the payments

In sum, the Court should reverse Simmons's money laundering convictions under the logic of *Santos* and *Cloud*. If it does so, the Court must also vacate his entire sentence, including the sentences imposed on the fraud convictions (if this Court affirms those convictions, *but see* Section II). Reversal of the money laundering convictions would require a *de novo* resentencing because the sentences on all counts were based on an initial Guidelines calculation under the money laundering Guideline, § 2S1.1. *See* JA 1139. In this circumstance, appellate courts routinely require *de novo* resentencing because, to be procedurally reasonable, a sentence must be based on a properly calculated Guidelines range. *See, e.g.*, *United States v. Castro*, 704 F.3d 125, 143 (3d Cir. 2013) (reversing one conviction required resentencing on second conviction because the Guidelines range was based, in part, on the reversed conviction); *United States v. Genao-Sanchez*, 525 F.3d 67, 70 (1st Cir. 2008) (vacatur of two of three counts required resentencing where the revised Guidelines range "may or may not differ" from the range used at the initial sentencing); *see also Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (the advisory Guidelines range "provide[s] a framework or starting point . . . for the judge's exercise of discretion.").

---

designed to encourage future investment, the refund was a response to the investor's complaints and was intended to "discourage[e] detection of [the] scheme." *Id.* at 816.

The Government does not suggest that this aspect of *Van Alstyne*'s holding applies here. And for good reason: the payments to Bazluki and Lux were made before the Ponzi scheme began to unravel and, as the Government admits, were intended to encourage further investment. Those payments are thus indistinguishable from the payments *Van Alstyne* found "essential" to the Ponzi scheme.

## II.    The Admission Of Victim-Impact Testimony Requires Vacatur Of Simmons's Convictions.

Simmons argued in his opening brief that the admission of victim-impact testimony about the devastating effect of the Ponzi scheme on the victim-investors was irrelevant, highly prejudicial, and rendered his trial fundamentally unfair, requiring this Court to vacate his convictions. *See* Simmons's Op. Br. at 17-25.

In its response, the Government effectively concedes that the most "gut wrenching" of this testimony—that investor Mary Lynn Van Horn's losses forced her into a life of crime, resulting in a shoplifting conviction for stealing groceries—was not relevant to any fact at issue in Simmons's trial. *See* Gov't Br. at 45 (contending that Jeff Anderson's testimony was relevant, but never suggesting the same regarding Van Horn's).[2]  Instead, the Government asserts only that it "behooved the Government to elicit the fact of this conviction on direct examination" because Van Horn could have been asked about it on cross-examination under Federal Rule of Evidence 609(a)(2).  Gov't Br. at 47-48.  That rule permits impeachment based on a prior conviction that required proof of "a dishonest act or false statement."  Fed. R.

---

[2]    The Government argues that plain error review applies to Van Horn's testimony because Simmons did not object to it until after cross-examination.  Gov't Br. at 48.  The Government is wrong:  an immediate objection in the middle of the witness's testimony was not required.  As explained in his opening brief, Simmons objected to the admission of victim-impact testimony before trial and re-iterated that position repeatedly during trial, including moving for a mistrial following Van Horn's testimony.  Simmons's Op. Br. at 22.  Given this record of preservation, this Court is not limited to plain error review of Simmons's claim that the admission of victim-impact evidence rendered his trial fundamentally unfair.

Evid. 609(a)(2). But the Government is wrong to suggest that Rule 609 would have permitted the defense to impeach Van Horn based on her shoplifting conviction: numerous courts of appeals have held that shoplifting and similar theft offenses do not involve dishonesty within the meaning of Rule 609(a)(2). *See, e.g.*, *United States v. Washington*, 702 F.3d 886, 893-94 (6th Cir. 2012) (collecting cases).

The Government's specious Rule 609 argument makes clear that, far from being a legitimate component of the Government's case, the "gut wrenching" testimony from Van Horn served merely "to generate feelings of sympathy for the victims and outrage toward [Simmons] for reasons not relevant to the charges [Simmons] faced." *See United States v. Copple*, 24 F.3d 535, 545-46 (3d Cir. 1994). The admission of this testimony—especially when combined with similar victim-impact testimony from Jeff Anderson[3] and Neil Neciase[4]—rendered Simmons's trial fundamentally unfair and requires this Court to reverse his convictions.

---

[3]     The Government contends that Anderson's testimony—that the money he lost was needed to save his family's farm—was relevant to prove intent or materiality under this Court's decision in *Cloud*. Gov't Br. at 42-45. In making this argument, however, the Government fails to confront Simmons's argument that *Cloud* is not controlling because of the crucial factual differences between the mortgage fraud charged there and the investment fraud charged here. *See* Simmons's Op. Br. at 20-21.

[4]     The Government asserts that Neciase's victim-impact testimony was "non-responsive" to the Government's questioning and that its admission should be reviewed only for plain error because defense counsel did not immediately object. Gov't Br. at 47-48. But whether the testimony was directly responsive to the Government's questioning is irrelevant when analyzing its impact on the jury, which is the critical inquiry under Simmons's claim. And, as noted above, Simmons preserved

In seeking to save the convictions, the Government suggests that any error was cured by the district court's "instructions to the jury not to consider sympathy for investors like Van Horn in deciding whether the Government had met its burden of proof." Gov't Br. at 48-49. But this is not a case where the jury acquitted a defendant on one or more counts, so the mere presence of a curative instruction provides no reason for confidence that the jury was able to ignore the "gut wrenching" testimony and hew strictly to the Court's instructions. *Cf., e.g.*, *United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995) (holding that the defendant's acquittal on one of the two counts against him was "strong evidence" that the jury was capable of disregarding improper statements and carefully weighing the evidence).

Finally, the Government argues that any error was harmless because the evidence against Simmons was "overwhelming." Gov't Br. at 49-51. But the question for this Court is not whether the evidence was so strong that Simmons "would likely be convicted on a retrial." *United States v. Hughes*, 401 F.3d 540, 551 (4th Cir. 2005). Instead, this Court must reverse unless "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original). Reversal is required under that standard because, regardless of how strong the other evidence was, there remains a real possibility that the presence

---

his objection to the admission of victim-impact testimony throughout trial, so plain error is not the appropriate standard of review for that claim. *See supra* at n.2.

of irrelevant and "gut wrenching" victim-impact testimony led the jury to act on

emotion, not evidence. *See* Simmons's Op. Br. at 23-25.

## III. The District Court Committed Procedural Error In Applying The Aggravating Role Enhancement Based On Simmons's Role In The Underlying Fraud.

In his opening brief, Simmons argued that the district court committed

procedural error by applying § 3B1.1's aggravating-role enhancement based on

Simmons's role in the fraud offenses, rather than his role in the money laundering

offenses. *See* Simmons's Op. Br. at 34-38.

The Government does little to contest this argument on its merits. Instead, it

primarily argues that the Court should review Simmons's argument only for plain

error, a standard it contends he cannot satisfy. Gov't Br. at 58-60. This argument

lacks merit.

In his opening brief, Simmons acknowledged that his objection to the

aggravating-role enhancement in the district court was based on a different *argument*

than the one he advances on appeal. *See* Simmons's Op. Br. at 36 n.2. But, he argued,

his district court objection preserved for *de novo* (rather than plain error) review his

*claim* that the enhancement was improper, allowing him to "make any *argument* in

support of that *claim*" under the Supreme Court's decision in *Yee v. City of Escondido*,

503 U.S. 519, 534 (1992) (emphases added).

Rather than confront *Yee*, the Government cites two other cases that it says

mandate plain error review. Gov't Br. at 58-60 (citing *Puckett v. United States*, 556 U.S.

13

129 (2009) and *United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012)). But neither case presented the situation here, and neither decision addressed, much less undermined, the Supreme Court's clear holding in *Yee*. Tellingly, when the Seventh Circuit faced a case in the same posture as this one, it concluded that *Yee* mandated *de novo* review. *See United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) (concluding that *Yee* mandated *de novo* review where a defendant presented on appeal a new *argument* in support of his *claim* that the career-offender enhancement was improper).

Moving to the merits, the Government acknowledges that it is "not clear from the record" on what basis the district court imposed the enhancement. Gov't Br. at 61-62 ("It is not clear from the record, however, that the district court applied the enhancement based on Defendant's role in the fraud offenses, rather than based on his role in the money-laundering offenses."). Although the Government suggests that this lack of clarity works in its favor, that suggestion is wrong. Such a glaring lack of clarity as to the facts on which the court relied in imposing the enhancement is, by itself, enough to establish procedural error. *See United States v. Passaro*, 577 F.3d 207, 222-223 (4th Cir. 2009) (reversing for procedural error where district court applied enhancement "with no explanation" and its basis for imposing enhancement was "not clear from the record").

In any event, the Government never attempts to marshal the specific facts needed to support the enhancement. Rather, it simply argues that Simmons "controlled all aspects of the operation of the organization." Gov't Br. at 63. But

14

that isn't enough.  To sustain the enhancement, the Government needs to show that Simmons organized or led five or more criminally responsible "participants" with respect to the money laundering offenses.  U.S.S.G. § 3B1.1.  As set out in his opening brief, however, the record indicates that Simmons carried out the alleged money laundering transactions on his own and that no one else was criminally responsible for those offenses.  *See* Simmons's Op. Br. at 34-37.

Finally, the Government argues that Simmons "ignores the relevant conduct that the guideline instructs the district court to consider."  Gov't Br. at 64.  This argument is perplexing.  As Simmons argued in his opening brief, the applicable Guideline, § 2S1.1, clearly instructs that the only conduct to be considered in applying the aggravating-role enhancement is the conduct associated with the specific money laundering offense.  *See* Simmons's Op. Br. at 35-36.  No other conduct matters, even if it would be considered "relevant conduct" in other Guidelines contexts.

And, even if "relevant conduct" extended to conduct beyond the specific money laundering offense, the Government has not identified *any* money laundering offense in which Simmons organized or led five or more criminally responsible "participants." Accordingly, applying the enhancement was a procedural error that requires resentencing.

## IV.  A *De Facto* Life Sentence For Simmons Is Substantively Unreasonable.

The Government does not dispute that 50 years in prison is a *de facto* life sentence for Simmons, who was 47 years old at the time of sentencing.  Nor could the

15

Government dispute it: the Sentencing Commission itself treats any sentence over 470 months as a *de facto* life sentence for statistical purposes, regardless of the offender's age. *See* U.S.S.C., 2011 Sourcebook of Federal Sentencing Statistics, Appendix A. Such a sentence for Simmons—a non-violent, first-time offender—is greater than necessary under § 3553 and is, therefore, substantively unreasonable.

Although the Government recites the district court's explanation for the sentence (Gov't Br. at 66-67), it fails to address the fact that a raft of similar offenders who perpetrated *larger* frauds have received significantly *lighter* sentences. *See* Simmons's Op. Br. at 41-42. Rather than contesting this highly relevant information, the Government argues that a sentencing court cannot consider "financial loss and length of sentence . . . in a vacuum." Gov't Br. at 67. Instead, according to the Government, the harsh sentence is justified because the scheme caused "utter[ ] devastat[ion]" for its victims. Gov't Br. at 67-68. But, in making this argument, the Government ignores that similar—if not greater—devastation was caused by each of the larger frauds cited by Simmons. If the Government is right that a court cannot consider the amount of loss "in a vacuum," then it must also be true that a *de facto* life sentence cannot be justified based solely on the harm caused to the victims of that loss.

Aside from emphasizing the harm to the victims, the Government does little in its brief to address Simmons's assertion that his sentence is "greater than necessary" to achieve § 3553(a)'s purposes. It does not, for example, respond to his argument

16

that the Guidelines range of life imprisonment—based on the widely criticized fraud guideline—"fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007); *see* Simmons's Op. Br. at 39-40. The Government also makes no attempt to dispute Simmons's argument that a *de facto* life sentence is greater than necessary to achieve specific and general deterrence, in light of his age[5] and the impact that these convictions have on his ability to re-commit a similar offense. *Id.* at 41.

In sum, full consideration of the § 3553(a) factors shows that Simmons's sentence is greater than necessary and therefore must be vacated as substantively unreasonable.

## <u>CONCLUSION</u>

For the reasons stated above and in his opening brief, the Court should vacate Keith Simmons's convictions. Alternatively, it should vacate his sentence and remand to the district court for a new sentencing hearing.

---

[5]     According to Sentencing Commission statistics, for example, "[r]ecidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50. *See* U.S.S.C., Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 12 and Exhibit 9 (May 2004).

The 3rd day of April, 2013.

Henderson Hill, Executive Director
Federal Defenders of
Western North Carolina, Inc.

/s/ Ann L. Hester
Ann L. Hester
Assistant Federal Defender
129 W. Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720

/s/ Joshua B. Carpenter
Joshua B. Carpenter
Appellate Attorney
One Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992

Counsel for Appellant Keith Franklin Simmons

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*4,421*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Garamond*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>April 3, 2013          </u>          <u>/s/ Joshua B. Carpenter          </u>
                                                    *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 3rd day of April, 2013, I caused this Reply Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

> Amy E. Ray
> OFFICE OF THE U.S. ATTORNEY
> 100 Otis Street, Room 233
> Asheville, North Carolina  28801
> (828) 271-4661
>
> *Counsel for Appellee*

I further certify that on this 3rd day of April, 2013, I caused the required copies

of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Joshua B. Carpenter
*Counsel for Appellant*
